23-2040 National Association for Rational Sexual Offense Laws v. Stein Mr. Dubling? Good morning, Your Honor. Your Honor, may it please the Court. My name is Paul Dubling. I represent the appellants, the plaintiffs below. As this Court is aware, this is a challenge to the modern version of the North Carolina Sex Offender Registry on the grounds that it has become an ex post facto punishment, regardless of how it may have started. I think it's important to note that we are not challenging in this case the idea that North Carolina can have a registry. We're not even challenging that that registry can legally morph from the type of collection and dissemination of information scheme that was approved by a divided Supreme Court in 2003 into a system of control that not only places serious limits on where registrants can live, where they can work, where they can simply be present, a system that subjects them to discretionless, and this is in the trial court's ruling, standardless supervision by law enforcement officials. The law allows law enforcement police to come to registrants' homes to do compliance checks without standards, and the undisputed testimony of the people subject to that is those compliance checks can happen more often than monthly, in many cases, and frequently monthly. It varies state by state or county by county because there are no standards. The question is whether the state can impose those restrictions retroactively. We're not asking the Court to strike down the North Carolina Sex Offender Registry. We're asking the Court to come to the common sense conclusion that it has reached the point where it is punishment, and because it is punishment, it cannot be applied retroactively. The state is free to impose punishment. It is free to set limits. It is free to place controls on people on the registry. I guess just to refine the issue, and I understand your claim, punishment, I gather, would look backward to the conduct and add additional punishment for that, and I suppose there's a distinction between some kind of administrative classifications forward-looking to provide safety to the public. For instance, somebody who's been convicted of embezzlement will not be allowed to hold a position of trust. We don't consider that punishment, but that is a status forward-looking to protect the public, and so the line between the two, I think, is difficult, and that's where your argument is resting. Is this punishment for the original conduct, or is this forward-looking safety regulations based on the status of conviction, I guess? As you know, we have a lot of examples in the law where people are disqualified from certain jobs because of convictions. You can't have security clearance on you being convicted of a crime, that type of thing. Yes, Your Honor, there are two points to that. One, as I'll explain, I don't believe that law is as difficult to draw as sometimes the existing body of law makes it out. You had mentioned Black's Law Dictionary. Black's Law Dictionary defines punishment as the imposition of sanctions because of a crime, and that's exactly what's going on here. You commit the crime... Well, if it's punishment, if you call it punishment, that sort of begs the question. We're trying to find out whether restrictions on a sex offender with respect to where the sex offender can go is punishment or a future protection of society based on his status of conviction, and I suppose he can get so how do we define the distinction between acting on someone's status and punishment? Has the Supreme Court addressed that line? It is not, Your Honor, beyond the Smith v. Doe case. One of the things that's going on is the Supreme Court's... You would agree, though, that Black's Law Dictionary would mean that all of these sex registry things are punishment, right? I mean, I understand why you want to suggest that that's the line because that would mean that any sex registry provision, because it is imposed as a result of a conviction. No, Your Honor, and I think this goes back to Judge Niemeyer's point. Black's Law Dictionary defines it as a loss of rights or advantages consequent on a breach of law, the definition of punishment. So in Smith v. Doe itself... That would mean a person who's convicted of embezzlement, if he's in the future precluded from holding a position of trust, you would say that's punishment because he's denied a benefit because of his conviction. Could be, Your Honor, but if you look at Smith v. Doe, what it actually says is, look, all that's going on in these registries, this is Smith v. Doe, all that's going on is the collection and dissemination of information. There's no loss of rights or advantages. That's really the central holding of Smith v. Doe. In most of the cases that you're referring to, it's not... What's going on is someone loses some special privilege, like the basic rights and advantages available to all citizens. I think that's part of the distinction here. We're not talking about the loss of your ability to be classified as a doctor, your ability to act as a stockbroker. We're not talking about your loss of special status. We're talking about your loss of basic rights and amenities available to citizenship. And the examples that were just posited, that's an absolute loss of a right, the right to practice law or be a doctor. In this case, it isn't an absolute loss of rights. It's just, admittedly, much more difficult to engage in the daily activities that other people engage in, like buying housing, go to recreational parks, et cetera, because of the fact that one has been listed on the registry. But it's not a complete loss of the right, is it? It's near, Your Honor. North Carolina law, and this is one of the factors that distinguishes the North Carolina registry from every other registry that I'm familiar with, and certainly with the registries at issue in Smith v. Doe and this Court's opinion in Settle, it actually creates exclusion zones. The evidence in the case, as you'll see when you look, is that because of these 300-foot barriers that are created around any place for the use of minors, there are large portions of public spaces that registrants simply can't be. Registrants can't be, according to the section. Under the law, registrants can't be in churches. And in North Carolina, people have been prosecuted for attending a church that has a Sunday school. They can't be in public parks. They can't be anywhere near playgrounds. They can't be in community centers. They can't often be in theaters. This statute, not the one in Settle, not the one in Smith, not even the one in Shaw from Alabama. Can you turn back to Settle? You didn't address it in your opening brief, but I at least want to give you a chance to settle. What about this provision gets you to think that you can reach a different, that a panel, I get the en banc court is different, but that a panel could reach a different result from Settle? How would you have us distinguish the registration there and the rationale given in Settle from here? Sure, Your Honor. So in Settle, they specifically noted that the particularly onerous provisions of the Virginia law, the kind that are analogous, like the anti-loitering position, all of those under the Virginia scheme are actually part of the criminal law. The Virginia legislature separated out the registry, which is, when Settle looked at it, was ultimately analogous to the provisions at issue in Smith. And so Settle just follows Smith. The parts of the Virginia laws pertinent to registrants that are onerous, the exclusions that we're talking about, were actually part of Virginia law and weren't considered by the Settle court because the Virginia legislature correctly acknowledged that those types of provisions go far beyond Smith. They're part of the criminal law and therefore can't be applied retroactively. So Virginia actually did it right. They have separately a regulatory scheme that this court said, that's like Smith, that's civil. They placed the particularly onerous provisions into their criminal law and said, we can do this. This is the Virginia legislature. Sure, we can impose these kinds of restrictions on registrants, but we can't do it retroactively because they create punishment, because they are criminal law. Is that what the legislature said? That's what they did, Your Honor. That's what the Settle court actually looks at. There's a whole passage in Settle where they say, we take note of the fact that the anti-loitering provisions, these other aspects, are specifically part of Virginia criminal law. All that suggests that there's one way to do it. Virginia has one way to do it, and North Carolina has taken a different route. You haven't suggested, nor does it indicate that the reason why the legislature in Virginia did it is because of concerns about where to draw the line between punishment and concern for public safety. Respectfully, Your Honor, I would disagree and say it definitely indicates that the legislature was aware and drawing a line. Which legislature? The Virginia State Legislature, Your Honor. When they divided their- I took the Chief's point to be in part, but it's like, why is that pertinent to us, our evaluation of North Carolina? Because- Um, but why does that matter here? Because, Your Honor, you had asked, how does this panel distinguish the North Carolina registry scheme from Settle? It's just those provisions. So you would say it's only the provisions that Settle didn't pass on because they were not part of the registry that we could reach. No, Your Honor, but I would say that that is how you distinguish it. Settle may have been a close case. Settle, when you look at Settle- What's that? May not have been a close case, too. Respectfully, Your Honor, reading the case, I note that Settle struggled with the point that Judge Niemeyer raised about the definition of punishment. Is this punishment? And Settle felt, I believe, if you read it, largely bound by Smith because the registry- Because Smith's from the Supreme Court? No, because the registry schemes they were actually considering in Settle were just essentially, and at the end, the collection and dissemination of information provisions of Virginia law, which are part of their registry and which are analogous to Smith, and not the affirmative disabilities and restraints, the types of housing, employment, simple presence in a public case sorts of statutes that are an integral part of North Carolina's registry scheme and are being applied retroactively. They're criminal laws under Virginia statute. They can't be applied retroactively, which makes ultimately the point. This Court is not being asked to say North Carolina can't do this. It's being asked to say, if you want to do this, you have to call it what it is, like Virginia did. Call it a criminal law. And that's ultimately what the Supreme Court says in Smith. The first question we ask is, is this a criminal law? And I submit to the Court that it is in North Carolina law. Unlike the provisions in Smith, it's entirely codified in the criminal law. All of the procedures associated- Just on that, are we, should we be looking to the purposes of punishment as identified in, say, Section 3553 of the Title 18, the purposes of sentencing? Yes. Deterrence and punishment, those types of things. Yes, Your Honor. Under Smith, the Court directs a two-part inquiry, one asking whether it is a criminal law. Even if it's not a criminal law, the Court looks to see, are the effects of the law punitive? And under the analysis for whether it's a punitive law, the Court directs the Court to consider, does this serve the purposes of punishment, incapacitation, deterrence, and retribution? And I submit in this case, the entire purpose of this law, even as articulated by North Carolina, is incapacitation. The undisputed expert testimony in this case is that the only way these laws work to counter recidivism, which is the concern here, future sex acts, is through deterrence. But importantly, it is uncontroverted in- thought it's more, if somebody abuses children sexually and is convicted of that, the argument is, it doesn't make common sense to say he can now run a child camp or a playground or something like that. In other words, we just don't want to put him back into the context where he committed those crimes. And so it's a prophylactic, it seems to me, that society is looking at. And we've done that across a lot of different statutes. But Your Honor, the registry is not limited to people who abuse children. The registry- Oh, it's all sex abuse, obviously. But we're talking in this case, the man's involved with child abuse. But looking at the law, the registry applies to people that haven't committed felonies, people who have never committed an offense against a minor, people who have not engaged in non-consensual contact, people who have not- I'm using the word registry, not sex offender. We're talking about- we're not talking about the scope of the clarity. We're talking about whether this is punishment in violation of ex post facto cause, right? But one of the things we look to in deciding whether it's punitive in effect is the fit between the purported aim and the scope of the scheme. If this were a registry that said, if you are convicted of molesting children, we're going to stop you from running a daycare center, completely different story. But that's not what's going on here. Smith says that the state can make reasonable categorical judgments. But the undisputed evidence in this case is that- I mean, you've agreed that the state can say, we're not going to have them run a daycare center. Well, that's rational. And so your argument really comes down to the scope or the degree of restriction that the state imposes on a sex offender. And what's interesting about all the cases is that if you read Smith, it says, well, this is a civil regulatory scheme and it's okay because it doesn't limit where people live, limit where people work. It doesn't render them not free to do as others do in society. If you look at Shaw, it says, well, this is okay because it's not like people are excluded from public spaces. If you look at Settle, all of the things that would cause those problems are already part of the criminal law. So this statute specifically does all of the things that these other cases say would be a problem, would cross that line. And that's what we're here to say. You're right. I believe this is a criminal law, and I've outlined that in my brief. I don't think the court needs to get to the second stage of the inquiry. But when it does, then you'll see that under the analysis set forth by Smith, it's absolutely clear, one, that this is wildly excessive. And two, that this statute does exactly what all these other cases say you can't do. What do you think the most significant, what do you think is your best piece of the registry provision? What do you think is sort of most oppressive and looks most like punishment? If you just had to pick one of them to think about. May I answer that question in two parts, Your Honor? You can start with the answer, and then you can give an explanation, if that's what you mean. Well, there's one in terms of that this goes way too far. And that is the exclusion zones of 14-28.18 that not only keep all registrants out of a vast array of public places, but has already been ruled by this court in Doe v. Cooper to significantly infringe First Amendment liberties. Second, with regard to whether this is a criminal law, I ask the court to consider that when someone goes to petition to be let off the registry, the victim of the underlying criminal offense is notified and invited to come and give a statement to the court. It's a parole hearing. The court, when someone comes before the court to ask to be removed from the registry, it's a criminal hearing at which the victim of the underlying offense testifies. It then looks very specifically back to the original conviction. That is not a forward-looking prophylactic measure. So what, if nothing else, what tips this over the line? It's excluding registrants wholesale from large varieties of public space. If nothing else, what makes clear that this is ultimately a criminal law that looks a lot like traditional forms of punishment? At the end of the day, we go back to the victim of the offense and ask them if it's okay to end this regime. All right. Thank you, Mr. Dublin. Thank you, Your Honor. General Park. Thank you, Your Honors. May it please the Court. I'm Ryan Park from the North Carolina Department of Justice, representing Attorney General Stein and the District Attorney Defendant. For several decades, as this Court is aware, every state in the nation has maintained a registry of sex offenders, and many states, including North Carolina, also impose substantive restrictions on their movement, their occupations. As you know, these laws have also garnered significant litigation. The Smith case, the Settle case, several other cases decided by this Court. And so in all of those cases that are at least binding on this Court have upheld sex offender registries, the Federal Registry, SORNA, Virginia's registry in Settle, and Alaska's in Smith. Not all sex registry statutes are the same. Exactly. And I think if we give the appellant his due in this case, he's really focusing on probably three things that really trouble him. One, the limitation on where he can live. Two, the job he can hold. And three, the places where he can go. And the question is, is there a degree to which we have to limit that to some extent? And what are the standards for doing so? Or is that unlimited in the discretion of the state? It's not unlimited, Your Honor. And I agree that that is the relevant focus. What are the incremental differences between, I think, most pertinent here, Virginia's registry and North Carolina's? And do those differences mean that North Carolina has crossed the line into imposing punishment? But we haven't actually talked very much about what the Supreme Court's test is for punishment. In Settle itself, Judge Richardson noted in footnote 12 that you could come up with many different definitions of punishment in this two-part intense effects test from Kennedy-Mendoza. That's not what the Supreme Court has done. It has not looked at Blackstone or these general theories of punishment. It has said, did the legislature, in the text and structure of the statute, intend to punish? And if they did, well, that's punishment. If they did not, and we give essentially controlling weight to the way that the legislature has structured its intent, then— that's probably helpful in a lot. But what if the legislature says this is not punishment, but then imposes a restriction that looks like punishment? Right. And I think then you go to the effects part of the analysis. And I think it's worth emphasizing the effects part of the analysis is a multi-factor test. There's no controlling factor. And I think that's evidenced most powerfully by Kansas v. Hendricks, Sealing v. Young. These are U.S. Supreme Court cases from a generation ago where they upheld civil commitment schemes in prison after the active term of incarceration as not punishment, as civil regulatory schemes, because the state's interest in maintaining active confinement of certain highly dangerous sex offenders was still a civil means. And so the question here is, you know, you have to put it through the five-factor test. And I'm happy to talk about those three restrictions. I agree that those are the relevant differences. Now, one point of— Just to understand, your point of that is that even if the registry included incarceration of some sort, the citation to those cases suggest to us that that wouldn't per se be punishment. We'd have to run through the analysis. You're not saying that it wouldn't pass that test. You're just saying we would have to do this same analysis even if it was actual incarceration, much less these lower-level restrictions. And I think what the Supreme Court said in Smith is, you know, if you're going to actively confine someone in, you know, the same prison they were confined in during their criminal sentence, what you need to do is have an individualized hearing to determine whether they're continuing to be dangerous. And those hearings, by the way, had all the trappings of a criminal proceeding. I mean, you had right to counsel. You had, you know, a district attorney, a local district attorney was bringing the charges. The criminal procedures, you know, mirrored the criminal procedures in a criminal proceeding. But the court nevertheless held that because the purpose of the law was to make sure that highly dangerous sex offenders were not released into the community, it was still civil. But here, I think there's one really important clarification. Would you think that it's appropriate to phrase the issue that the interest, the state's interest in public safety and security, the public from the type of crime that had been committed outweighs the restrictions that are being imposed? Something to that effect. Yeah, I mean, I think if you run through the analysis, the question is whether there was a rational basis, a reasonable basis for determining that these restrictions advance public safety and not retribution and deterrence. When we incarcerate somebody for being a dangerous sex offender, we have a whole scheme set up. We have a hearing process and they have fairly restrictive standards. Of course, we really are taking away the liberty at that point. And it's not intended as punishment. It's intended as protection of the public. Yes, Your Honor. And I think one very important clarification, again, from Hendricks, I'm sorry this isn't in the briefs, but they say explicitly that incapacitation may, this is a quote, may be a legitimate end of a civil law. And they say that because the overriding concern was, I'm still quoting, the continued segregation of sexually violent offenders, it's consistent with our conclusion the Act establishes civil procedures, and civil proceedings. And so, of course, we're not saying that we're here to defend a continued confinement scheme. We're simply putting this forward as a helpful comparison to understand that you actually have to run through the multi-factor analysis and not just make general allusions to whether something feels punitive. General Park, one of the arguments that Mr. Dubling makes is that what the legislature has created here is a pretty blunt instrument that doesn't really take into account the various nuances related to sex offenses. It treats, it's a kind of one size fits all. That seems problematic, is it? So I think that there's a factual correction that I can make and then a legal point. The factual correction is, I agree, the most onerous restrictions are in subsection 18 of the statute. We have this in the appendix of our brief. These restrictions on where you can go, essentially, you can't visit schools and parks, you can't be within, you know what the restrictions are. Those only apply to people who have been convicted of certain enumerated crimes. And that was because of the Doe v. Cooper case that Mr. Dubling mentioned. All those crimes are all sexually violent offenses or offenses against minors. And so these most onerous restrictions, it's in the, you have to kind of work through the subsections of the statute to see that that's what's going on. Those are the offenders who have the subsection 18 restriction imposed on them. Again, the legislature responded to this court's decision in Doe v. Cooper and narrowed the range of offenders who are subject to these restrictions. The, if, it's just sort of piggybacking a minute on the Chief's point. If it was the case, if we were to find that it was a blood instrument, I understand your factual response, would that, how would that affect our, like, punishment analysis under this sort of two-part test that we've got? It might be a problem. Maybe it's a due process problem. Maybe it's an equal protection problem. How would it affect this for sort of the ex post argument? I think if you run through the analysis and it's really, we're not treading new ground here. The Supreme Court and Smith said explicitly, and this court echoed and settled, that reasonable categorical judgments can be made as to the categories of offenders in this context. And so the same argument was advanced in that Virginia case. And this court said that merely the lack of an individualized determination for these kinds of registration restrictions does not make, mean that it crosses the line into punishment. I think the other thing to get on the table really here, and we haven't discussed it much yet, is, again, the Supreme Court said, the most important factor is whether the law is rationally related to a legitimate public safety purpose. And I think there's really no dispute that that is present here. That's what the court said in settle. Now, I agree that some of the restrictions in settle in Virginia are different than those in North Carolina. But there are many on the other side of the line here. I mean, Virginia requires employment information on the registry. North Carolina does not. It establishes a DNA database for all registrants. North Carolina does not. It also has a 15-year minimum for registration, whereas North Carolina has a 10-year minimum. And two of the six registrants who testified at trial were let off the registry after 10 years, even though their crimes involve sex offenses perpetrated against minors. Need all of the registrants that testified at trial commit sexual offenses perpetrated against minors. And Mr. Dubling portrays some of these as consensual, but one of the offenses that he portrays as consensual involved a 12-year-old girl who the offender testified and conceded at trial that he picked her up while she was walking around the neighborhood and went into her bedroom, and they engaged in sexual intercourse. Now, that is not, by the definition of law, not a consensual sexual encounter. And I think that really just echoes the overriding public safety purpose of these laws generally. I mean, your honors are all aware that the provenance of these laws were in the early 90s. There was widespread publicity of certain sexual offenses where if there was greater information sharing, if there were some barrier that had been imposed between someone who was convicted of a sex offense and minor children, that maybe these offenses could have been prevented. The Megan's Law, Megan Kanko was a 7-year-old girl who was raped and murdered by the new neighbor across the street who had been convicted of sexually violent offenses. Now, of course, you could look at these laws and run through the analysis and think, well, really, they're actually just out to get these guys. But what the Supreme Court has said is that's not what you do. You give deference to the legislature and their good faith. And when they put the purpose of the statute right in the text of the statute, the protection of the public from what we judge to be highly dangerous sex offenders, then these information sharing regimes and these barriers that are put in place are intended to create a civil regulatory regime akin to Kansas v. Hendricks and Sealing v. Young, except instead of these very onerous restrictions of continued confinement, we'll just try to regulate in a more modest way. Mr. Dubling also pointed out a couple of the conditions that he suggests make it onerous for offenders to exercise First Amendment rights, either in a religious sphere or expressive activity. But this is not a First Amendment case, and I suppose those challenges can be brought as they have been, right, in the past? Absolutely, Your Honor. And again, Mr. Dubling was counsel in Doe v. Cooper. He succeeded in, at that time, convincing a panel in this court that certain of the restrictions violated the First Amendment. If you look at the complaint here, the complaint has counts, and all the counts say it violates the ex post facto clause of Article I and these First Amendment concerns, my understanding arose for the first time on appeal, at least framed as relevant to the analysis of whether they're punishment. I would like to also just point the court's attention to some of the factual findings that Judge Biggs made that supported her legal conclusion that these are not punitive measures. So she found that, yes, there are housing and occupational difficulties that a registrant's face, and this is on page 84 of the joint appendix, that the plaintiffs failed to prove that these are attributable to the registry status and to the registry's restrictions, that many of them, it was impossible to disentangle the fact that these criminal convictions are a matter of public record. North Carolina Department of Public Safety also maintains an online registry of all criminal convictions in the state, and you can do the same thing. You can put people's name into the registry information, they don't call it a registry, and find out the criminal convictions. You conduct regular background checks. Many of the registrants who testified said that their landlords, their employers committed regular background checks and found out about these crimes of conviction, and therefore they had housing and employment difficulties. But the most important finding that Judge Biggs made is that the overwhelming majority of registrants, around 99%, which is roughly analogous to the general population among people who have been released from active incarceration, are able to secure housing, and at least the evidence at trial showed that although they face difficulties, registrants are able to participate as members of society. They have jobs and have families. Now, this is not to discount the restrictions that are in place, and we accept that on the affirmative disabilities prong of the analysis, there are affirmative disabilities and restraints that are imposed based on the registry, but the question for the court, if you run through the analysis, is whether those punitive effects are so overwhelming that they override the basic civil regulatory purpose of the law. And I think that if you just focus on the incremental differences between Virginia's registry and federal SORNA and North Carolina's, it doesn't cross that threshold. I think there are, I guess, a couple other points, if I may, to take the court's time. So I think a lot of the focus of the briefing was whether these registry laws work, right? Whether, as a matter of economic fact, they reduce the net number of sex crimes that are committed across society, and that is simply not the relevant question for this court in settle itself. The court said that these are disputed matters of economic fact. There's studies going every which way, and if we were in strict scrutiny land, maybe the state's burden would be to prove, as a matter of empirical fact, that these registry laws work. But that's not the test that the Supreme Court has established. It's akin to rational basis review. Those are words that are used in the settle opinion. It's akin to rational basis review. And so the mere fact that there's not a close or perfect fit, that's a quote from settle, does not mean that these laws are suddenly punitive. It, the overriding inquiry is whether the legislature intended to create a scheme to protect the public from the risks of sex offenders. I think one, I think the last point I would make, Your Honor, is that Mr. Gibling mentioned the, you know, kind of intuitive similarities between this scheme and probation and supervised release. And I agree, if you look quickly, you might think, okay, well, these are kind of similar. It's a supervision scheme. But Judge Biggs explicitly found that this is not akin to supervision. A couple points here. She made a factual finding that the in-person compliance checks are what she said, quote, brief and rote. The evidence showed that many of these interactions just involve dropping off the form at the sheriff's office and no interaction with a uniformed law enforcement officer whatsoever. When you have to drop off a form every six months, verifying your address that you haven't, you know, changed your facial features, that's your physical appearance, you know, that's a requirement of the statute. Those are not punitive supervisory measures. The in-person compliance checks as well at the people's homes, two points on that. One, same in Virginia. A plaintiff in this court accepted in Virginia that there were random house checks that occur periodically in Virginia and this court held it was not punitive. But more importantly, the evidence showed that, you know, often there's no in-person interaction at all in those in-person checks. What it is, is sometimes it's a marked car. Sometimes it's a law enforcement person, depending on the county, as Mr. Dubling mentioned. Sometimes it's administrative personnel in an unmarked car who goes up and puts a door tag on the person's, you know, residence that they've registered in. And all you have to do is call and say, I got the door tag. I still live in this home. These are not the kinds of onerous supervisory mechanisms that are akin to probation. And the record itself demonstrates what probation really looks like. The, you know, one of the, James Doe, I think it was 631 or something, in the joint appendix. He testified that when he was on parole, he had an ankle monitor. He had an 8 p.m. curfew. He couldn't use a computer. He couldn't use a car. And this is, you know, standard. You can't leave the jurisdiction without approval. You can't move or change jobs without approval. Probation usually has, you know, an individual assigned probation or parole officer where you have to meet with them, sometimes weekly. Submit to drug testing. Say, you know, I'm going to refrain from alcohol. I'm going to remain employed. I'm going to stay in school. I mean, those are the kinds of onerous conditions that are akin to probation. But I suppose under your view of things, if the state had decided to include some or all of those conditions in this registry, that still would be a question of effects and it wouldn't be a per se determination that that was punishment. Yeah, I think that if the North Carolina General Assembly had established a scheme that was akin to probation, what that would mean is that that factor would cut against us in terms of whether this is punitive or not. And then you'd have to run through the analysis. And the reason why the Kansas v. Hendricks example is so helpful to understanding that this is really a multi-factor balancing test, regardless of whether that makes for an easy inquiry, is in that case, I mean, everyone agrees, continued confinement in a prison setting means that the state loses on that prong. There's five prongs. State loses on that prong. But still, if you conduct the balancing, the court said, well, the state wins on these other prongs in terms of whether the registry as a whole is designed to protect the public or to punish these people. And so, yeah, I agree. If we had established a probation scheme, we would lose on that prong, but I think we would still prevail overall. All right. Thank you, Mr. Park. Mr. Dubling. Thank you, Your Honor. A couple quick factual corrections. If the court looks at the statute 14-208.18, there are four separate provisions. In response to Doe v. Cooper, the North Carolina legislature limited the applicability of only one of those. Three of those four still apply to registrants largely as a whole. Two, with regard to Mr. Park's statement regarding Judge Biggs' finding, she also found there are no standards related to how compliance checks under the statutes must be conducted. The frequency and manner in which law enforcement conducts in-person compliance checks varies among sheriffs and counties. And the other testimony in this case is that at times that was conducted with a SWAT team. At times that's conducted with multiple police cars rolling up. At times that's conducted near weekly. That lack of standards is important. Judge Richardson, you had asked how the fact that this is a blunt instrument affects the analysis. And I submit respectfully that Smith conflates rational basis and excessiveness into the inquiry whether this is a reasonable fit. Reasonable categorical judgments are authorized, not unreasonable ones. And here, the unrebutted evidence in this case is that recidivism rates for sex offenders are low. And again, this registry includes people that are not sex offenders. The unrebutted evidence in this case is that 10 years after someone convicted of one of these offenses is released from prison, if they have not been arrested or charged with a new offense, statistically they are no more likely than someone else without one of these convictions. Wait, but the if there matters a lot, right? What you're saying is 10 years later, the people that have not been caught re-offending are no more. But that's leaving out the group. I mean, this is the main point of this is you get 10 years that you're in the program. That's the period that we're asking about. The evidence you're talking about is for those that don't get caught 10 years later, maybe there's some statistics that support their lack of recidivism. But this is 30, Your Honor. The registry scheme in North Carolina is 30 years where it's life. 10 years is... The time in which you can get off. The time in which you can petition the court where you bear the burden. And again, where the victim of your offense is going to be brought back at which you can have a hearing. That's only available for some registrants. For all registrants, it's called time to redemption. It's undisputed. If 10 years later, there's no statistical difference between someone convicted of one of these offenses and someone who is not in terms of dangerousness, that is a fact. It is undisputed in this case that the registry law does not increase public safety. It's an undisputed fact. So General Park made the argument that whatever your statistical evidence might suggest that the government doesn't bear a burden of disproving the statistics, right? This doesn't require... It's not, you know, heightened scrutiny, right? It's, as Settle said, akin to rational basis. And so the fact that you might have studies that suggest that doesn't get you anywhere. I assume you disagree with that, but why? It doesn't seem... I do agree, Your Honor, because this court is charged with looking at the evidence in this case and determining whether this registry scheme is excessive. It's charged with a number of things laid out in Smith v. Doe, but that is a central component of this court's analysis. And the evidence in this case is that it is excessive, both because it starts from a premise. It is not rational to legislate, not just on presupposition, but in direct contravention. That argument is very broad because that argument suggests that sex registries, because the data shows there's no recidivism difference between that and other crimes, that's your supposition, that therefore imposing sex registration requirements would be punishment, whereas they don't do it for a tax violator. You don't have to register as a tax violator. And because the recidivism on a tax violator is low, you say the same recidivism statistics occur. And aren't we past that in terms of registration statutes generally? Your Honor, if we go back... Exactly. If we go back... I thought we were really... Getting so broad, it seems to me where your argument seems to focus and is probably best made is while we have registration statutes that are acceptable, this one is excessive, you argue, because it imposes punishment in view of section 16, 17, and 18. And that those are beyond the pale and are punishment and therefore violate the ex post facto clause. To go and start talking about the recidivism statistics and whether legislature had the right to impose a registration statute or to treat sex offenders different from tax violators, you're not seriously having us consider all that stuff, are you? No, Your Honor. But what I'm saying is these considerations are relevant to the excessiveness wrong of the inquiry under Smith v. Doe. And what I'm saying is that this is excessive as to time, it's excessive as to scope, and it's excessive as to the actual restraints that are placed on people on the registry. That's what I'm saying, Your Honor. Thank you, Mr. Doolin. Thank you for your arguments. We'll come down and greet counsel and take a short recess. Dishonorable court will take a brief recess.
judges: Albert Diaz, Paul V. Niemeyer, Julius N. Richardson